Filed 8/6/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| In re W.B., JR., a Person Coming Under the Juvenile Court Law. _____ | ) ) ) | |
| | ) | |
| THE PEOPLE, | ) ) | S181638 |
| Plaintiff and Respondent, | ) ) | Ct.App. 4/2 E047368 |
| v. | ) ) | Riverside County |
| W.B., JR., | ) ) | (Super. Ct. No. RIJ114127) |
| Defendant and Appellant. _____ | ) ) ) ) | |

Passed in 1978, the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA, or the Act) formalizes federal policy relating to the placement of Indian children outside the family home. State courts presiding over adoption, guardianship, and dependency matters have become familiar with the many requirements of this federal law. Historically, however, ICWA provisions have not been applied in the juvenile delinquency context because ICWA includes an express exemption for placements "based upon an act which, if committed by an adult, would be deemed a crime." (25 U.S.C. § 1903(1).)

The minor argues state legislation has expanded ICWA to delinquency proceedings under Welfare and Institutions Code section 602.[1] The Courts of Appeal have considered the question with varying results. Here, we determine the

_____

[1] All California statutory references are to the Welfare and Institutions Code.

1

federally required scope of ICWA in juvenile delinquency proceedings and whether our Legislature has expanded those requirements. Consistent with the federal statutes, we hold that California law requires the court to *inquire* about a child's Indian status at the outset of all juvenile proceedings, but that ICWA's additional procedures are not required in most delinquency cases. A delinquency court must ensure that *notice* is given and other ICWA procedures are complied with *only* when (1) exercising "dual status" jurisdiction over an Indian child (see *post*, at pp. 9-11); (2) placing an Indian child outside the family home for committing a "status offense" (§§ 601-602; see *post*, at p. 5); or (3) placing an Indian child initially detained for "criminal conduct" (§ 602; see *post*, at pp. 5-6) outside the family home for reasons based entirely on harmful conditions in the home. In this narrow third category, ICWA notice is required when the delinquency court sets a permanency planning hearing to terminate parental rights, or when the court contemplates ordering the ward placed in foster care and announces on the record that the placement is based entirely on abuse or neglect in the family home and not on the ward's delinquent conduct. Without a clear announcement from the court to the contrary, it will be presumed that a placement of a section 602 ward is based on the ward's delinquent conduct, rather than conditions in the home, and thus not subject to ICWA.

## I. BACKGROUND

The minor, W.B., Jr. (W.B.), has been the subject of several delinquency petitions. He was referred to probation in 2003 and 2006 on allegations of felony burglary and robbery, but these matters were closed for lack of evidence. Referred to diversion in November 2006 for possessing marijuana on school grounds, he failed to complete the program. On March 27, 2007, shortly before his 15th birthday, a section 602 petition alleged he committed felony burglary and receipt of stolen property. On May 3, 2007, a second section 602 petition alleged he committed battery with serious bodily injury. On May 23, 2007, a third section 602 petition alleged residential burglary. At a combined hearing, after

2

W.B. admitted the battery and one burglary allegation, he was declared a ward of the juvenile court. The court ordered that he be placed outside the home. The court later reconsidered this order, released him to his mother, and directed that both participate in the Wraparound Program.[2]

In June 2008, another section 602 petition was filed alleging robbery. At a contested jurisdiction hearing, the victim testified that as he was leaving school W.B. approached from behind and hit him in the jaw, causing him to drop his cellular phone. A boy with W.B. picked up the phone, and the two ran off with it. The court found the allegation true and continued the minor as a ward. The probation officer's dispositional report noted that "ICWA may apply" because W.B.'s mother had reported possible Cherokee ancestry. There was no history of physical, sexual, or emotional abuse. Although the probation department recommended that he continue on home supervision and in the Wraparound Program, the People urged a placement outside the home because W.B. had not "learned to appreciate the seriousness of his conduct." Following the probation department's recommendation "with some misgivings," the court released him to his mother's custody and ordered continued participation in the Wraparound Program.

On October 14, 2008, just two months after disposition of the robbery case, a subsequent 602 petition was filed alleging residential burglary. W.B. and two others broke into a home through a sliding glass door and stole a number of items. The court found the burglary allegation true and set the maximum confinement time at six years. The probation officer's report once again stated that "ICWA may apply" because W.B.'s mother had reported Cherokee ancestry. No history

---

[2] As the Court of Appeal below noted, the Wraparound service program was started in 1997 to provide "family-based service alternatives to group home care using intensive, individualized services . . . . The target population for the program is children in or at risk of placement in group homes . . . . (State Dept. of Social Services Web site <http://www.childsworld.ca.gov/PG1320.htm> [as of Jan. 20, 2010].)"

of abuse was reported, and the child welfare agency confirmed that it had no active dependency case involving the family.

The probation officer reported that the county's interagency placement committee (CIPC) unanimously recommended that W.B. be placed in foster care. The committee believed his treatment needs, which included "anger management, victim awareness, [and] impulse control," would be best met in a placement program. Although he had appeared to be making progress at home, he had continued to commit criminal acts and posed a threat to the community's safety. The probation department endorsed the CIPC recommendation. The court ordered placement in a foster care facility and directed W.B. to comply with terms of probation. He would be returned to his mother's custody upon successful completion of the placement. The aggregate term of potential confinement was eight years eight months.

On appeal, W.B. argued the dispositional order placing him in foster care had to be reversed because the juvenile court had failed to comply with the notice requirements of ICWA. The Court of Appeal disagreed, holding notice was not required because federal law specifically excludes delinquency cases from ICWA, and any interpretation of California law that would expand ICWA's application to delinquencies would be invalid under federal preemption principles. We granted review.

## II. DISCUSSION

A. *Overview of California's Juvenile Court Law*

In California, the juvenile court's jurisdiction over a minor can be invoked in two ways: (1) by a dependency petition (§ 300), which alleges the child's home is unfit due to parental abuse or neglect; or (2) by a delinquency petition, which accuses the child of either disobedience or truancy (§ 601) or the violation of a law that defines a crime (§ 602). The terms "delinquency" and "status offense" have been employed somewhat loosely in various contexts. Before beginning our

4

analysis, it is useful to clarify the definitions of these terms and explain how they fit into the statutory framework.

Allegations that a minor refuses to obey orders of a parent or guardian, is beyond parental control, violates age-based curfew ordinances, or is truant or disobedient in school, must be brought in a petition filed under section 601. (§ 601, subd. (a).) These allegations, which are specifically delineated in section 601, are commonly called "status offenses" because they address conduct that is not criminal but is nevertheless subject to punishment because of the offender's status as a person under age 18. (See *In re Lucas* (2004) 33 Cal.4th 682, 731; *R.R. v. Superior Court* (2009) 180 Cal.App.4th 185, 198.) Strictly speaking, "[a]n adjudication under section 601 neither requires nor implies a finding of 'delinquency.' " (*In re Bettye K.* (1991) 234 Cal.App.3d 143, 151.) Section 601 allegations are not the only status offenses considered by the juvenile court, however.

Section 602 confers broad juvenile court jurisdiction over allegations that the minor's conduct "violates any law." (§ 602, subd. (a).) Some penal statutes proscribe conduct only when it is committed by a minor. For example, although an adult may legally consume alcohol, underage drinking is not permitted. (Cal. Const., art. XX, § 22; see generally *In re Jennifer S.* (2009) 179 Cal.App.4th 64 [discussing local and state laws prohibiting underage drinking].) Likewise, although an adult may lawfully purchase cigarettes, a minor cannot. (Pen. Code, § 308, subd. (b).) Offenses like these, which can be committed only by a person under 18, are technically status offenses, but they are adjudicated under section 602 because they describe a minor's conduct that "violates any law." (§ 602, subd. (a); see, e.g., *In re Jennifer S.*, at p. 67.) Section 602 also encompasses conduct by a minor that would be a crime if committed by an adult.

In the broadest sense, adjudications under section 300 are "dependency" proceedings, and adjudications under sections 601 and 602 are "delinquency"

proceedings. When the juvenile court assumes jurisdiction over a child under section 601 or 602, the minor is described as a "ward" of the court.

In the course of our discussion, we will occasionally refer to a minor's "criminal conduct" as a shorthand to differentiate behavior that would constitute a crime if committed by an adult from status offenses, which are punishable only because of the minor's age. However, in juvenile court, a minor is not designated as a "defendant," nor accused of a "crime," even though the allegation would describe a crime in adult court. (§ 203.) The determination whether a minor has violated a criminal provision is made solely in order to establish that the juvenile court has jurisdiction. Once this determination is made, the juvenile court can declare the minor a ward of the court and order a disposition that will address the minor's behavior. A juvenile adjudication is not a "conviction" (*In re Bernardino S.* (1992) 4 Cal.App.4th 613, 618), and thus a ward of the juvenile court is not "sentenced" for violating the law, even when disposition of the ward's case involves removal from home for a period of confinement.

1. *Foster Care Placements in Delinquency Proceedings*

A temporary or permanent foster care placement typically arises in the context of juvenile dependency proceedings, in which the court determines whether a child's home is unfit. If allegations of parental abuse or neglect are substantiated, the court assumes jurisdiction and removes the child from the family home for the child's own well-being. Such a child is adjudged to be a "dependent" of the court. (§ 300 et seq.) When a dependent child is placed in a foster home, the family generally participates in reunification services, with the goal of the child's safe return to parental custody.[3] Meanwhile, the dependency case proceeds through an intricate system of review hearings. Because family reunification is not always possible, child welfare workers also explore

---

[3]   In some extreme cases, the court can deny services and foreclose any attempt at reunification. (§§ 361.5, subd. (b) [dependency], 727.2, subd. (b) [delinquency].)

6

alternatives for a child's permanent placement outside the home through guardianship or adoption. The dependency process culminates in a permanency planning hearing, at which the court determines whether the child can be safely returned home or, if not, whether parental rights must be terminated and the child released to a permanent placement. (§ 366.26.)

Although the great majority of children enter foster care through the dependency process, a child may also enter foster care in a delinquency placement.[4] Foster care placement is one of several dispositional options available to the delinquency court. If the allegations of a section 602 petition are found true, the court may dismiss the petition in the interest of justice (§ 782), place the child on informal probation for up to six months without a declaration of wardship (§ 725, subd. (a)), or declare the child a ward of the juvenile court (§ 725, subd. (b)) and proceed to disposition.

While a delinquent ward may be allowed to remain at home, the grounds for removing a ward from parental custody are established by statute. Removal is warranted only if the court finds: (1) the parent has not or cannot provide "proper maintenance, training, and education" for the child; (2) previous attempts at in-home probation have failed to reform the child; or (3) the child's welfare requires that custody be taken from the parent. (§ 726, subd. (a).) When removed from the family home, the ward comes under the supervision of the probation department. (§ 727, subd. (a).) Depending on the severity of the offense and other rehabilitative considerations, the juvenile court may direct that the ward be placed

---

**4** In July 2009, approximately 63,000 California children were in foster care under the supervision of child welfare departments. Another 5,000 were in probation-supervised foster care because of their involvement with the criminal justice system. (Danielson & Lee, *Foster Care in California: Achievements and Challenges* (May 2010) Public Policy Institute of California, p. 5 <http://www.ppic.org/main/publication.asp?i=905> [as of Aug. 6, 2012] (*Foster Care in California*).) Children who entered foster care through delinquency proceedings generally comprise less than 10 percent of the population in foster care. (*Id*. at p. 17, fn. 13.)

7

in a nonsecure home or facility or may order that the ward serve a period of physical confinement, either in a secure local facility (§ 730, subd. (a) [juvenile home, ranch, camp, forestry camp, or juvenile hall]) or in the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF) [formerly the California Youth Authority], which is the most restrictive placement. (§ 731; *In re Eddie M.* (2003) 31 Cal.4th 480, 488.) If a nonsecure placement is found to be appropriate, the probation department may place a removed ward in the home of a relative, in a licensed community care facility, or in foster care. (§ 727, subd. (a).) A group home is the predominant out-of-home placement chosen for delinquent wards.[5]

If a delinquent ward is removed from parental custody, even temporarily, reunification services must usually be provided to address the minor's needs and facilitate a safe return to the family home. (§ 727.2, subd. (a).) The reunification process generally mirrors that followed in dependency. Although dependency and delinquency law differ in several ways, the Legislature has announced that both types of proceedings serve the purpose of preserving and strengthening family relationships. (*In re James R.* (2007) 153 Cal.App.4th 413, 430.) Family preservation and reunification are "appropriate goals" for a court to consider in determining the disposition of a delinquent minor, so long as they are consistent with public safety and the best interests of the minor. (§ 202, subd. (b); see *In re L.M.* (2009) 177 Cal.App.4th 645, 650.)

Every six months, the court must review the status of a ward removed to foster care. (§ 727.2, subd. (c).) At each review hearing, the court considers: (1) the appropriateness and continuing need for the placement; (2) the probation department's compliance with the case plan for either returning the child home or finalizing an alternative permanent placement; (3) whether limitations should be

---

[5]    In 2009, 96 percent of probation-supervised minors first removed from parental custody were placed in a group home. (Danielson & Lee, *Foster Care in California*, *supra*, at p. 18, fn. 27.)

8

placed on the parent's ability to make educational decisions for the child; (4) progress made by the child and parent in correcting the conditions that created the need for the foster care placement; (5) the likely date when the child can be returned home or released for a permanent placement; and (6) whether services are necessary for a child age 16 or older to transition from foster care to independent living.  (§ 727.2, subd. (e).)  If the child is not returned home within 12 months after entering foster care, the court must hold a permanency planning hearing.  (§ 727.3, subd. (a)(1).)  At this hearing, it may return the child home, order the child into a different permanent placement, or order that further services be provided.  (§ 727.3, subd. (b).)  Possible permanent plans include a termination of parental rights, followed by release for adoption; a legal guardianship; placement with a relative; or placement in a "planned permanent living arrangement," such as a foster home, program, or facility.  (§ 727.3, subd. (b)(3)-(6).)  As of January 1, 2012, if a child will soon turn 18, or if the court finds that delinquency supervision is no longer necessary, the court must consider whether to assume dependency jurisdiction over the child.  (§ 727.2, subd. (i).)

2.	*"Dual Status" Minors*

Delinquency courts follow a system parallel to that used in dependency courts for removing a child from the family home.  The dependency and delinquency systems serve overlapping but slightly different aims, however. Whereas the dependency system is geared toward protection of a child victimized by parental abuse or neglect, the delinquency system enforces accountability for the child's own wrongdoing, both to rehabilitate the child and to protect the public.  (§ 202, subds. (a), (b).)

Although California juvenile courts address the needs of dependent and delinquent minors differently, some minors who come before the court seem to fall under *both* systems.  Sociological research has demonstrated a strong link between childhood abuse or neglect and later delinquent behavior.  (See, e.g., Judicial Council of Cal., Fact Sheet, Intersection Between Juvenile Dependency

9

and Delinquency: Available Research (June 2005) pp. 2-4 <http://www.courts.ca.gov/documents/Ab129-FactSheetMay05.pdf> [as of Aug. 6, 2012].)  Research reveals that dependent children violate criminal laws at a significantly higher rate than children who have not been the subject of dependency petitions.  (Dunlap, *Dependents Who Become Delinquents: Implementing Dual Jurisdiction in California under Assembly Bill 129* (2006) 5 Whittier J. Child & Fam. Advocacy 507, 511-512.)  In general, however, California law prohibits a minor from simultaneously being declared a dependent child and a delinquent ward.

In 1989, in response to a Court of Appeal decision that outlined several potential problems with allowing concurrent delinquency and dependency jurisdiction over a minor (*In re Donald S.* (1988) 206 Cal.App.3d 134), the Legislature added section 241.1 to the Welfare and Institutions Code.  This statute generally prohibits the juvenile court from assuming dual jurisdiction over minors.  Section 241.1, subdivisions (a) through (d) state that when a minor appears to come within the description of both section 300 (dependency) and section 601 or 602 (delinquency), the county probation department and child welfare agency must consult with each other and jointly determine which status will best serve the interests of the minor and the protection of society.  Based on this joint assessment, the juvenile court decides whether the child should be treated as a dependent child or a delinquent ward.  (*Los Angeles County Dept. of Children & Fam. Services v. Superior Court* (2001) 87 Cal.App.4th 320, 325; *In re Marcus G.* (1999) 73 Cal.App.4th 1008, 1013.)  "Dual jurisdiction is generally forbidden . . . ."  (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1123.)

In 2004, the Legislature created a small exception to the ban on dual jurisdiction.  Section 241.1, subdivision (e) allows a minor to be designated a "dual status child," and treated simultaneously under the court's dependency and delinquency jurisdiction, but only in accordance with a precise written protocol. The statute requires that the protocol be developed jointly by the county's

10

probation department and child welfare agency and signed by the heads of these entities as well as the presiding judge of the juvenile court.  (§ 241.1, subd. (e).)  To avoid duplication of services, county protocols must adopt either an "on-hold" system, in which dependency jurisdiction is suspended while the child is a ward of the delinquency court, or a "lead court/lead agency" system, in which the probation department and social services department decide which agency will take the lead in all case-management and court-related matters.  (§ 241.1, subd. (e)(5).)

Few California counties have adopted these joint protocols, however.  Currently, eight years after the enactment of section 241.1, subdivision (e), only nine of California's 58 counties have filed dual status protocols with the Judicial Council.  (Judicial Council of Cal., Dual Status Children: Protocols for Implementing Assembly Bill 129 <http://www.courts.ca.gov/7989.htm> [as of Aug. 6, 2012].)[6]  The reluctance to embrace dual status designation has generated skepticism about the efficacy of section 241.1, subdivision (e)'s approach and led to calls for broader reforms.  (See McCulloch, *Still Between a Rock and a Hard Place . . . Victim or Delinquent: Dual Status Minors in California—An Illusory Promise?* (2007) 28 J. Juv.L. 118, 132.)

B.  *Federal Law Regarding Placement of Indian Children*

In the juvenile dependency system, children are removed from the family home not as punishment for their own misconduct, but because conditions in the home subject them to abuse or neglect.  Additional procedures are required if a child is of Indian heritage.  Congress has determined that, as a matter of federal policy, protective steps must be taken before an Indian child may be removed.  In 1978, these protections were codified in ICWA.  (25 U.S.C. § 1901 et seq.)

---

**6**      The counties with protocols are:  Colusa, Inyo, Modoc, Placer, Riverside, San Joaquin, Siskiyou, Sonoma, Stanislaus.  (Judicial Council of Cal., Dual Status Children: Protocols for Implementing Assembly Bill 129 <http://www.courts.ca.gov/7989.htm> [as of Aug. 6, 2012].)

Dependency courts and social workers are accustomed to complying with ICWA, which applies when an Indian child is removed from parental custody, even temporarily. However, because Congress created a specific *exemption* for placements based on a child's criminal conduct (25 U.S.C. § 1903(1)), it has long been understood that ICWA's requirements do not apply in most juvenile delinquency cases. (See, e.g., *In re Enrique O.* (2006) 137 Cal.App.4th 728.)

     1.    *ICWA Requirements*

ICWA is a federal law giving Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation. (25 U.S.C. § 1911(b)-(c); *Mississippi Choctaw Indian Band v. Holyfield* (1989) 490 U.S. 30, 36.)[7] Congress enacted ICWA to further the federal policy " 'that, where possible, an Indian child should remain in the Indian community. . . .' " (*Mississippi Choctaw Indian Band v. Holyfield*, at p. 37.) Congress found that Indian children were vitally important "to the continued existence and integrity of Indian tribes" (25 U.S.C. § 1901(3)), but "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and . . . placed in non-Indian foster and adoptive homes and institutions . . . ." (25 U.S.C. § 1901(4).) Congress further found "that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (25 U.S.C. § 1901(5).) Based on these findings, Congress declared a national policy "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of

---

[7] Tribal courts have exclusive jurisdiction in these proceedings when the child lives on a reservation. (25 U.S.C. § 1911(a).)

12

Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.)

When applicable, ICWA imposes three types of requirements: notice, procedural rules, and enforcement. (See *In re S.B.* (2005) 130 Cal.App.4th 1148, 1156-1157.) First, if the court knows or has reason to know that an " 'Indian child' " is involved in a " 'child custody proceeding,' " as those terms are defined in the Act (25 U.S.C. § 1903(1), (4)), the social services agency must send notice to the child's parent, Indian custodian, and tribe by registered mail, with return receipt requested. (25 U.S.C. § 1912(a).) If the identity or location of the tribe cannot be determined, notice must be sent to the Bureau of Indian Affairs (BIA). (*Ibid.*) No hearing on foster care placement or termination of parental rights may be held until at least 10 days after the tribe or BIA has received notice. (*Ibid.*)

Next, after notice has been given, the child's tribe has "a right to intervene at any point in the proceeding." (25 U.S.C. § 1911(c).) "At the heart of the ICWA are its provisions concerning jurisdiction over Indian child custody proceedings. . . . [I]n the case of children not domiciled on the reservation: on petition of either parent or the tribe, state-court proceedings for foster care placement or termination of parental rights are to be transferred to the tribal court, except in cases of 'good cause,' objection by either parent, or declination of jurisdiction by the tribal court." (*Mississippi Choctaw Indian Band v. Holyfield*, *supra*, 490 U.S. at p. 36, fn. omitted.) If the tribal court does not assume jurisdiction, ICWA imposes various procedural and substantive requirements on the state court proceedings. Indigent parents or Indian custodians have the right to court-appointed counsel. (25 U.S.C. § 1912(b).) Before the court can place an Indian child in foster care or terminate parental rights, it must find "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have

13

proved unsuccessful." (25 U.S.C. § 1912(d).) A foster care placement also requires a finding, by clear and convincing evidence, based on testimony from "qualified expert witnesses," that "continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(e).) Before a termination of parental rights may occur, likelihood of harm must be proven beyond a reasonable doubt. (25 U.S.C. § 1912(f).) Once the appropriate showing is made, ICWA establishes rules for the placement of an Indian child outside the home. "The most important substantive requirement imposed on state courts is that of § 1915(a), which, absent 'good cause' to the contrary, mandates that adoptive placements be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indian families." (*Mississippi Choctaw Indian Band v. Holyfield*, at pp. 36-37.)

Finally, an enforcement provision offers recourse if an Indian child has been removed from parental custody in violation of ICWA. Upon a petition from the parent or the child's tribe to "any court of competent jurisdiction," a foster care placement or termination of parental rights will be invalidated if the action was conducted in violation of ICWA. (25 U.S.C. § 1914.)

    2.  *ICWA Definitions*

ICWA is quite precise in setting out the scope of its provisions. It applies to any " 'child custody proceeding' " involving an " 'Indian child.' " (25 U.S.C. § 1903.) An "Indian child" is an unmarried person under 18 who is either a member of an Indian tribe or is eligible for membership and is the biological child of a tribe member. (25 U.S.C. § 1903(4).) A " 'child custody proceeding' " is any action resulting in a foster care placement, termination of parental rights, preadoptive placement, or adoptive placement. (25 U.S.C. § 1903(1).) A " 'foster care placement' " refers to the temporary removal of a child from the parent or Indian custodian to a foster home or institution, or the home of a guardian or conservator, where parental rights have not been terminated but the parent or

14

Indian custodian cannot have the child returned on demand. (25 U.S.C. § 1901(1)(i).) The Act specifies, however, that "[s]uch term or terms *shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime* or upon an award, in a divorce proceeding, of custody to one of the parents." (25 U.S.C. § 1903(1), italics added.) Thus, by its plain terms, the Act specifically excludes most delinquency placements from its requirements.

Congressional intent to preclude the application of ICWA in most state juvenile delinquency proceedings is also evident from collateral materials. For example, a letter from the assistant secretary of the Department of the Interior to the sponsor of the bill that enacted ICWA,[8] stressed that limitations on the Act's scope were "crucial to the carrying out" of its provisions. (H.R.Rep. No. 1386-95, 2d Sess., p. 31 (1978).) The Interior Department believed "delinquency proceedings where the act committed would be a crime if committed by an adult should be excepted from the definition" of placements to which ICWA applied, because the "standards and preferences" of ICWA "have no relevance in the context of a delinquency proceeding." (*Ibid*.)

Federal guidelines published by the BIA to guide state courts in implementing ICWA also state that "most juvenile delinquency proceedings are not covered by the Act . . . ." (U.S. Dept. of the Interior, Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67584, 67587 (Nov. 26, 1979) (BIA Guidelines).)[9] However, according to the BIA Guidelines, "the Act does apply to status offenses, such as truancy and incorrigibility, which can only be committed by children, and to any juvenile

---

[8]     House Bill No. 12533, 95th Congress, 2d Session (1978).

[9]     Although Congress directed the Secretary of the Department of the Interior to promulgate regulations (25 U.S.C. § 1952), the BIA instead issued a set of guidelines that are instructive but not determinative of state court decisions. (BIA Guidelines, 44 Fed.Reg. at p. 67584; see *In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1301.)

delinquency proceeding that results in the termination of a parental relationship." (BIA Guidelines, 44 Fed.Reg. at p. 67587.) Commentary to this guideline explains why Congress excluded most delinquency placements from ICWA's requirements: "The entire legislative history makes it clear that the Act is directed primarily at attempts to place someone other than the parent or Indian custodian in charge of raising an Indian child—whether on a permanent or temporary basis. Although there is some overlap, juvenile delinquency proceedings are primarily designed for other purposes. Where the child is taken out of the home for committing a crime it is usually to protect society from further offenses by the child and to punish the child in order to persuade that child and others not to commit other offenses." (*Id*., 44 Fed.Reg. at p. 67587.) This rationale for excluding delinquency matters from ICWA does not apply to status offenses because Congress believed placements outside the home for status offenses "are usually premised on the conclusion that the present custodian of the child is not providing adequate care or supervision." (*Ibid*.) However, the BIA Guidelines explain that ICWA applies to *all* placements, regardless of the type of offense, if a termination of parental rights is contemplated. (*Id*., 44 Fed.Reg. at pp. 67587-67588.) "Such terminations are not intended as punishment and do not prevent the child from committing further offenses. They are based on the conclusion that someone other than the present custodian of the child should be raising the child." (*Id*., 44 Fed.Reg. at p. 67588.)

In summary, ICWA grants the parents and custodians of Indian children, as well as the child's tribe, several procedural and substantive rights in "child custody proceedings." As defined in the Act, these proceedings include all foster care or adoptive placements of Indian children *except* placements made in the context of most juvenile delinquency proceedings and parental custody awards in divorce proceedings. (25 U.S.C. § 1903(1).) Congressional intent to exclude most delinquency-based placements from ICWA is clear.

16

C.	*California's Implementation of ICWA*

1.	*Background*

After Congress enacted ICWA, the states adopted procedures to implement it. For many years, the only guidance for California's juvenile courts in applying ICWA came from a California Rule of Court.[10] Former Rule 1360, and then former Rule 1439, incorporated most of ICWA's definitions and established substantially identical requirements for the placement of Indian children outside the home. (See *In re Santos Y.*, *supra*, 92 Cal.App.4th at pp. 1301-1303.) The rule's application was expressly limited to juvenile dependency proceedings. (Former Rule 1439(b) ["This rule applies to all proceedings under section 300 et seq. . . ."].) However, in 2005 the Judicial Council expanded the rule to cover all delinquency proceedings when the child is at risk of entering foster care or is in foster care. (*R.R. v. Superior Court*, *supra*, 180 Cal.App.4th at p. 199.) These amendments survive in the current version of the rule. (Rule 5.480.)[11]

In 2006, with the passage of Senate Bill No. 678 (2005-2006 Reg. Sess.), the Legislature incorporated ICWA's requirements into California statutory law. (Stats. 2006, ch. 838.) The primary objective of Senate Bill No. 678 was to increase compliance with ICWA. California Indian Legal Services (CILS), a proponent of the bill, observed that courts and county agencies still had difficulty

---

[10]	All citations to rules refer to the California Rules of Court (hereafter Rule or Rules).

[11]	Under Rule 5.480 et seq., ICWA "applies to all proceedings involving Indian children that may result in an involuntary foster care placement; guardianship or conservatorship placement; custody placement [with a nonparent]; declaration freeing a child from the custody and control of one or both parents; termination of parental rights; or adoptive placement, including: [¶] . . . [p]roceedings under Welfare and Institutions Code section 300 et seq., *and sections 601 and 602* et seq. in which the child is at risk of entering foster care or is in foster care . . . ." (Italics added.) The only exception is for "voluntary foster care and guardianship placements where the child can be returned to the parent or Indian custodian on demand." (Rule 5.480.) As we will discuss (*post*, fn. 17), this rule is overbroad.

17

complying with ICWA 25 years after its enactment, and CILS believed codification of the Act's requirements into state law would help alleviate the problem. (Sen. Judiciary Com., Analysis of Sen. Bill No. 678 (2005-2006 Reg. Sess.) as amended Aug. 22, 2005, p. 6.) To accomplish this goal, Senate Bill No. 678 revised and recast several provisions of the Family, Probate, and Welfare and Institutions Codes. (See Assem. Com. on Judiciary, Analysis of Sen. Bill No. 678 (2005-2006 Reg. Sess.) as amended June 14, 2006, p. 1.)

### 2. *California's Statutory Scheme*

ICWA's many procedural requirements for juvenile dependency and delinquency cases are found in sections 224 through 224.6 of the Welfare and Institutions Code. We examine these statutes to determine whether, and to what extent, the Legislature extended requirements of the federal Act to delinquency proceedings in California.

Established principles of statutory construction apply. Our goal is to determine the Legislature's intent and adopt a construction that best effectuates the purpose of the law. (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 888; *In re J. W.* (2002) 29 Cal.4th 200, 209.) We begin with the statutory language because it generally provides the most reliable indication of legislative intent. (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 625; *People v. Gardeley* (1996) 14 Cal.4th 605, 621.) " 'If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls. [Citation.]' [Citation.] We consider extrinsic aids, such as legislative history, only if the statutory language is reasonably subject to multiple interpretations." (*Miklosy v. Regents of University of California*, at p. 888.)

### a. *Statutory Language*

Section 224.3 defines when and how the juvenile court must inquire about a child's possible Indian ancestry. Section 224.3, subdivision (a) states: "The court, county welfare department, and the probation department have an affirmative and

18

continuing duty to inquire whether a child for whom a petition under Section 300, 601, or 602 is to be, or has been, filed is or may be an Indian child in all dependency proceedings and *in any juvenile wardship proceedings if the child is at risk of entering foster care or is in foster care*." (Italics added.) This language is clear. It creates an obligation for the juvenile court, the county welfare department, and the probation department to inquire about the child's Indian status in all dependency proceedings and in *any* delinquency case involving a child who is already in foster care or who appears to be at risk of entering foster care. "At risk of entering foster care" is a term specifically defined. It "means that conditions within a minor's family may necessitate his or her entry into foster care unless those conditions are resolved." (§ 727.4, subd. (d)(2).) Accordingly, the court or the probation department must ask about Indian status at the outset of any delinquency case involving a child who is currently in foster care. If the child is not currently in foster care, the court and the probation department have a continuing duty to inquire about Indian status if, at any time during the proceedings, it appears that conditions in the child's family may require a foster care placement unless they are resolved. (§§ 224.3, subd. (a), 727.4, subd. (d)(1).)

Once the court has learned that a child under its jurisdiction may have Indian ancestry, the next step ICWA typically requires is notice to the tribe or, if no tribe is identified, to the BIA. (25 U.S.C. § 1912(a).) Obviously, ICWA requirements apply only in those cases that fall under the statutory scheme. Two California statutes describe the notice requirement and when it applies. Section 224.3, the same statute that establishes a duty of inquiry, provides in a later subdivision: "If the court, social worker, or probation officer knows or has reason to know that an Indian child is involved, the social worker or probation officer shall provide notice in accordance with paragraph (5) of subdivision (a) of Section 224.2." (§ 224.3, subd. (d).) Although section 224.3 does not specify what type of proceeding the Indian child must be "involved" in for the notice obligation to apply, this ambiguity is clarified by the cross-referenced statute.

19

Section 224.2, subdivision (a), states that "[i]f the court, a social worker, or probation officer knows or has reason to know that an Indian child is involved, any notice sent *in an Indian child custody proceeding* under this code shall be sent to the minor's parents or legal guardian, Indian custodian, if any, and the minor's tribe and comply with [several enumerated] requirements." (Italics added.)[12] The language of section 224.2, subdivision (a) limits the notice requirement to the context of "an Indian child custody proceeding." Thus, read together, sections 224.2 and 224.3 require that ICWA notice be provided *only* when an Indian child is involved in an Indian child custody proceeding. (See *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1370, 1387; *People v. Pieters* (1991) 52 Cal.3d 894, 899 [statutory provisions relating to the same subject should be harmonized].)

"Indian child custody proceeding" is a term of art. Section 224.1, subdivision (d) states, in part: " 'Indian child custody proceeding' means a 'child custody proceeding' within the meaning of Section 1903 of the Indian Child Welfare Act, including a proceeding for temporary or long-term foster care or guardianship placement, termination of parental rights, preadoptive placement after termination of parental rights, or adoptive placement." California's definition of the child custody proceedings to which ICWA applies thus incorporates, and is coextensive with, the definition in the federal Act.[13] As noted, the definition of "child custody proceeding" in title 25 United States Code

---

[12]    Subdivision (a)(5) describes the particular information that must be included in the notice. (§ 224.2, subd. (a)(5).)

[13]    The Legislature's desire to import the federal definition is also evident in section 224, subdivision (b), which declares that in "all Indian child custody proceedings, *as defined in the federal Indian Child Welfare Act*" (italics added), the court must consider legislative findings about California's interest in preserving tribal communities, strive to promote the stability of Indian tribes and families, and protect the best interests of the child.

20

section 1903 expressly *excludes* delinquency proceedings based on an act that would be criminal if committed by an adult.

Section 224.3, subdivision (a) is the only provision in California's ICWA legislation that expressly applies to juvenile delinquency proceedings. (See *R.R. v. Superior Court*, *supra*, 180 Cal.App.4th at p. 200.) All of the other statutes, including the two notice statutes just discussed, extend the rights and protections of ICWA to participants in "an Indian child custody proceeding." (E.g., § 224.4; see also §§ 224.2, subd. (a), 224.5, 224.6, subd. (a).) Because an "Indian child custody proceeding" by definition excludes proceedings to place a child outside the home based on conduct that would be criminal if committed by an adult (§ 224.1, subd. (d); 25 U.S.C. § 1903(1)), it follows that California's ICWA statutes impose no duty of notice, or any other ICWA procedures, in most delinquency cases alleging adult criminal conduct. A narrow exception applies when the court decides to place a delinquent ward outside the home for reasons *other than* the ward's criminal conduct. Even if the case began as a delinquency matter, circumstances may lead the court to remove a ward from parental custody because of abuse or neglect in the home. In such cases in which a placement is imposed because of dependency concerns and not, even in part, because of the ward's criminal conduct, both California and federal law require that ICWA procedures be followed.

The relevant statutory language indicates that, although the Legislature created a duty of inquiry in all cases involving a potential foster care placement, it did not extend ICWA's notice and enforcement requirements so broadly. Instead, consistent with federal law, the Legislature dictated that the notice and procedural protections of ICWA be provided only in the subset of delinquency cases that meet the federal definition of a "child custody proceeding," i.e., those based on considerations *other* than the child's criminal conduct.

In sum, from the language of the statutes, we distill the following. In all juvenile delinquency proceedings, including those alleging adult criminal conduct,

21

the court and the probation department have a duty to *inquire* about Indian status as soon as they determine that the child is in foster care or is at risk of entering foster care due to conditions in the child's home. (§§ 224.3, subd. (a), 727.4, subd. (d)(1).) *Notice* pursuant to ICWA is generally *not* required in a delinquency proceeding premised on conduct that would be criminal if committed by an adult. However, if, at the disposition stage or at any point in the proceedings, the court contemplates removing an Indian child from the parental home based on concerns about harmful conditions in the home, and *not* based on the need for rehabilitation or other concerns related to the child's criminal conduct, notice is required and all other ICWA procedures must be followed.[14]

b.      *Legislative History*

Legislative history also supports this interpretation. The primary purpose of Senate Bill No. 678 was to encourage full compliance with ICWA by codifying its requirements into state law. (Sen. Judiciary Com., Analysis of Sen. Bill No. 678 (2005-2006 Reg. Sess.) as amended Aug. 22, 2005, pp. 1, 6; Sen. Appropriations Com., Analysis of Sen. Bill No. 678 (2005-2006 Reg. Sess.) as

---

[14]    At oral argument, W.B.'s counsel asserted the duties of notice and inquiry cannot be separated because communication with the tribes is the only way to determine whether a child is truly an Indian child. (See § 224.1, subd. (a); 25 U.S.C. § 1903(4).) This argument goes too far. For example, it would require notice to the tribes in every single dependency case, even when there has been no suggestion of Indian ancestry or when the parents have disavowed such ancestry. We have never interpreted ICWA's duty of inquiry so expansively. Section 224.3, subdivision (a) describes when the duty to inquire arises, and subdivision (b) describes information that may provide reason to know an Indian child is involved. Contact with the BIA and tribes is required only if information produced by the initial inquiry gives the court, social worker, or probation officer reason to know the minor is an Indian child. (§ 224.3, subd. (c).) Although final confirmation of a child's Indian status may not occur until the tribes have been contacted, this is no reason to expand ICWA notice beyond the boundaries set by the Legislature. Section 224.3 imposes a duty to inquire about possible Indian status; it does not obligate the court to confirm that status with the BIA and tribes in every juvenile court case.

amended Aug. 22, 2005, p. 1; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 678 (2005-2006 Reg. Sess.) as amended June 14, 2006, p. 6.) To a large extent, the bill simply reorganized and supplemented existing provisions of the Family, Probate, and Welfare and Institutions Codes to address ICWA compliance. (Sen. Judiciary Com., Analysis of Sen. Bill No. 678 (2005-2006 Reg. Sess.) as amended Aug. 22, 2005, pp. 6-7.) Nothing in the history of Senate Bill No. 678 suggests an intent to override the criminal acts exception or expand ICWA to delinquency cases that Congress explicitly excluded.[15]

If our Legislature had intended to extend ICWA's protections to a whole new realm of juvenile delinquency cases otherwise exempted under the federal law, one would expect evidence of this intent to feature prominently in the legislative history. Yet, no mention of such a purpose appears. Legislative committee analyses consistently state that Senate Bill No. 678 "*clarifies* which proceedings, under California law, are Indian child custody proceedings" and thus "subject to ICWA." (Sen. Judiciary Com., Analysis of Sen. Bill No. 678 (2005-2006 Reg. Sess.) as amended Aug. 22, 2005, p. 12, italics added.) The committee reports say nothing about extending ICWA to delinquency placements based on criminal acts. Although the bill's sponsor mentioned delinquency at an informational hearing before the Senate Judiciary Committee, she stated only that Senate Bill No. 678 sought "to clarify what ICWA requires in juvenile court and of the county agencies in delinquency cases." (Sen. Judiciary Com., Transcript of

---

[15]   In some other respects, Senate Bill No. 678 did go beyond the protections in federal law to enact higher standards of protection. For example, ICWA requires a finding that active efforts were made to prevent breakup of an Indian family before a *government-initiated* foster care placement or termination of parental rights. (25 U.S.C. § 1912(d).) Senate Bill No. 678 expanded this requirement to private adoptions as well. (Stats. 2006, ch. 838, §§ 8-15; Sen. Judiciary Com., Analysis of Sen. Bill No. 678 (2005-2006 Reg. Sess.) as amended Aug. 22, 2005, pp. 8-9.) However, these expansions are directly addressed in the legislative history. The same cannot be said of an extension of ICWA to delinquency placements based on criminal acts.

23

Informational Hearing, "The Indian Child Welfare Act and Related Compliance Problems" (May 17, 2005) p. 4 [testimony of Sen. Denise Moreno Ducheny].)

A Court of Appeal case decided while the Legislature was actively considering Senate Bill No. 678 also supports the conclusion that the Legislature did not intend to extend ICWA to delinquency placements based on criminal conduct. In *In re Enrique O.*, *supra*, 137 Cal.App.4th at page 732, a minor who had committed a sexual battery was placed in a group home based on the aggressive nature of his offense, his "home situation," and the probation officer's belief that aggressive sexual misconduct required inpatient counseling. On appeal, the minor challenged the lack of ICWA notice. He asserted the 2005 amendments to former Rule 1439, which mandated notice in all section 601 and 602 proceedings in which the child is in or at risk of entering foster care, trumped the longstanding rule that ICWA does not apply in delinquency proceedings. (*In re Enrique O.*, at p. 733.) Despite the juvenile court's concern about the general well-being of the minor, the Court of Appeal concluded the placement was " 'based on' " the minor's criminal activity. The court reasoned: "This is not a case where criminal activity simply highlights a situation that results in removal from the home for reasons in the home; rather, the offenses appellant committed here placed him squarely and unavoidably within the delinquency exception of the ICWA." (*Id.* at p. 734.) More to the point, the court observed that the minor's interpretation of former Rule 1439 was in direct conflict with the federal statute on which it was based, "which is an untenable result." (*In re Enrique O.*, at p. 734.) Accordingly, the court refused to "interpret the California Rules of Court . . . to expressly contradict the ICWA by ordering ICWA notices and procedures to occur in all out of home placements arising out of acts that would be deemed crimes if committed by an adult. [Citations.]" (*In re Enrique O.*, at p. 735.)

24

The *Enrique O.* decision was published while the Legislature was considering Senate Bill No. 678.[16]  Because the Legislature is presumed to know about existing case law when it enacts or amends a statute (*People v. Overstreet* (1986) 42 Cal.3d 891, 897), we assume the Legislature was aware of *Enrique O.*'s holding that former Rule 1439 was inconsistent with federal law and invalid to the extent it would expand ICWA to delinquency placements based on acts that would be criminal if committed by an adult.  The Legislature did not signal an intent to supersede this holding.  In fact, it specifically adopted and incorporated the federal definition of "child custody proceedings" that is the origin of the delinquency exemption.  (§ 224.1, subd. (a), citing 25 U.S.C. § 1903.)  There is nothing to suggest the Legislature meant to expand ICWA to a subset of cases *specifically excluded* from the federal definition of "child custody proceedings" to which the Act applies.  On the contrary, if the Legislature had wanted to make ICWA applicable to a whole new category of cases, it would have made little sense for it to incorporate a federal definition directly contradicting such an extension.

### 3.    *Application of ICWA in Delinquency Cases*

We have determined that California's ICWA statutes require the following: In all juvenile court proceedings, both dependency and delinquency, the court, social worker, or probation officer must inquire about the child's Indian status whenever the child is in foster care or conditions in the child's family may potentially require a foster care placement.  (§ 224.3, subd. (a).)  Notice to the tribes and other ICWA procedures must be provided only if the case is a "child custody proceeding," as defined in 25 U.S.C. section 1903(1).  (§ 224.2, subd. (a).)  A case qualifies as a "child custody proceeding" if it will involve action taken to terminate parental rights or to place an Indian child in foster care or in an adoptive

---

[16]    The bill was introduced in August 2005.  The Court of Appeal decided *Enrique O.* on March 13, 2006, and this court denied review on June 28, 2006.  (*In re Enrique O.*, *supra*, 137 Cal.App.4th 728.)  Senate Bill No. 678 eventually passed on September 30, 2006.  (Stats. 2006, ch. 838.)

25

or preadoptive home or institution. (25 U.S.C. § 1903(1).) Any case involving placement of a child outside the home based upon an act that would be criminal if committed by an adult is *not* a " 'child custody proceeding' " and is thus exempt from ICWA. (25 U.S.C. § 1903(1).)[17]

Different types of juvenile court cases in California therefore require different levels of ICWA compliance. It is undisputed that all dependency proceedings must be conducted in compliance with ICWA. (See, e.g., *Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 253 ["The ICWA confers on tribes the right to intervene at any point in state court dependency proceedings"].) Delinquency proceedings brought under section 601 also fall within the purview of ICWA because they are based on conduct that would not be criminal if committed by an adult. However, ICWA procedures would be required only in the narrow instance in which a section 601 ward is temporarily or permanently removed from the family home. (See § 601, subd. (b) [expressing legislative intent that truant wards remain in parental custody].)

Whether ICWA applies in a delinquency case brought under section 602 depends, first, on the type of offense alleged in the petition. If the section 602 petition alleges only that the minor committed a status offense (see *ante*, at p. 5), ICWA compliance is required before the minor can be placed outside the home. Like placements under section 601 for truancy or incorrigibility, placements under section 602 based on the minor's commission of a status offense are subject to ICWA because they are not based on criminal conduct. However, if the

---

**17** Because it does not account for the limited applicability of ICWA in delinquency cases, the Rule of Court describing ICWA's requirements is overbroad. Rule 5.480 states that ICWA applies in all section 601 and 602 proceedings in which the child is in or at risk of entering foster care. Rules established by the Judicial Council are authoritative only "to the extent that they are not inconsistent with legislative enactments and constitutional provisions." (*In re Richard S.* (1991) 54 Cal.3d 857, 863.) As demonstrated, the relevant statutes limit ICWA's application to the narrow category of section 602 placements not based on the minor's delinquent conduct.

26

section 602 petition alleges the minor committed an act that would be a crime if committed by an adult, the proceedings are generally *exempt* from ICWA. ICWA procedures are ordinarily not required in such proceedings because the placement of a delinquent ward outside the home will almost always be based, at least in part, on the ward's criminal conduct.

In some rare cases, the court may remove a section 602 ward from home for reasons completely unrelated to the ward's offense. Placement of the ward in some type of foster care setting is one option available to the court at a section 602 disposition hearing. (See §§ 727, subd. (a)(3), 727.4, subd. (d)(1), 11402.) In typical delinquency cases, it can be presumed that such placements are made to address the child's misconduct and prevent future wrongdoing. In some rare cases, however, the court may elect to remove a section 602 ward from home and order a foster care placement solely because of parental abuse or neglect. Although a delinquency court cannot assume concurrent dependency jurisdiction over a ward except in a county with an approved dual status protocol (§ 241.1, subd. (d)), the delinquency court does have the power to remove a minor from home if the parent is not providing appropriate care. (§ 726, subd. (a).) These placements may result in termination of parental rights if reunification efforts are unsuccessful. (§ 727.3.) A termination hearing in delinquency court proceeds exactly like a termination hearing in dependency court. (§ 727.31, subd. (a); see § 366.26.)

Under our interpretation of the relevant statutes, ICWA compliance is required in these rare section 602 cases that proceed to a termination of parental rights or that result in a foster care placement motivated solely by concerns about parental abuse or neglect. If the court sets a permanency planning hearing to terminate parental rights over a delinquent ward, or if the court contemplates ordering a delinquent ward placed in foster care and *announces on the record* that the placement is based *entirely* on parental abuse or neglect and not on the ward's offense, notice must be sent to the relevant tribes and all other ICWA procedures

27

must be followed.  In all other section 602 cases, it will be presumed that a placement outside the home is based upon the minor's criminal offense and thus not subject to ICWA.

A hybrid situation is presented in "dual status" cases.  In counties with approved joint protocols, the juvenile court may exercise both dependency and delinquency jurisdiction over a minor who is designated a "dual status child." (§ 241.1, subd. (e); see *ante*, at pp. 9-11.)  The same principles we have discussed govern ICWA's application to dual status minors.  When the court exercises dependency jurisdiction to terminate parental rights or place a dual status Indian minor in foster care due to harmful conditions in the home, full ICWA compliance is required.  However, if the foster care placement of a dual status minor is motivated in part by the minor's delinquent conduct and the need for rehabilitation, the placement is exempt from ICWA.

To summarize, in both dependency and delinquency proceedings, the juvenile court must give notice and comply with other ICWA requirements before it can terminate parental rights over an Indian child or place an Indian child in foster care, or in an adoptive or preadoptive placement, due to abuse or neglect in the child's home.  ICWA procedures are thus required for out-of-home placements of dependent children and section 601 and 602 status offenders.  Depending on the reasons for the placement, these procedures may also be required when dual status minors are removed from home.  ICWA procedures are typically *not* required for placements of section 602 wards detained for criminal conduct.  Unless the delinquency court announces otherwise, on the record, it will be presumed that any placement of a section 602 ward outside the home is based, at least in part, on the ward's criminal conduct.  With rare exceptions for dual status minors and status

offenders, placements in delinquency proceedings are presumptively *exempt* from ICWA.**18**

D.      *Application to the Present Case*

The minor in this case came before the juvenile court on a section 602 petition alleging he had committed residential burglary, conduct that would be a crime if committed by an adult. The court found the allegation true and ordered him placed in a suitable public or private facility but returned to his mother's custody upon successful completion of the placement. No termination of parental rights was contemplated. On the contrary, the probation department reported that the minor had previously been making progress at home in addressing his problems with anger and impulsiveness. The department recommended a placement outside the home not because of abuse or neglect, but because the minor had continued to commit criminal acts and presented a risk to the safety of the community.

This was a straightforward juvenile delinquency case. W.B. had committed a string of serious crimes and was ordered to spend time in a controlled setting where he could receive treatment designed to rehabilitate his delinquent behavior. W.B. was not designated a "dual status" minor. The court ordered that he be returned home after a defined period of time, and he was in fact returned home. For the reasons discussed, ICWA does not apply to delinquency placements such as this, which are based on the minor's criminal acts and which do not contemplate an eventual termination of parental rights. Accordingly, assuming the minor was an Indian child, the juvenile court did not err in failing to give notice under ICWA.

---

**18**     Because we have concluded California's statutory scheme is entirely consistent with federal law, we do not reach issues of federal preemption.

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re W.B.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 182 Cal.App.4th 126
**Rehearing Granted**

_____

**Opinion No.** S181638
**Date Filed:** August 6, 2012
_____

**Court:** Superior
**County:** Riverside
**Judge:** Christian F. Thierbach

_____

**Counsel:**

Jonathan E. Demson, under appointment by the Supreme Court, for Defendant and Appellant.

Mark Radoff and Delia Parr for California Indian Legal Services as Amicus Curiae on behalf of Defendant and Appellant.

Paulino G. Durán, Public Defender (Sacramento), Arthur L. Bowie and Randi Barrat, Assistant Public Defenders, for the Office of the Public Defender for Sacramento County as Amicus Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Steven T. Oetting and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

W. Scott Thorpe; and Albert C. Locher, Assistant District Attorney (Sacramento) for California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jonathan E. Demson
1158 26th Street, #291
Santa Monica, CA  90403
(888) 827-9153

Mark Radoff
California Indian Legal Services
609 S. Escondido Blvd.
Escondido, CA  92025
(760) 746-8941

Meredith S. White
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2297